IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| J.L. and P.L., individually and on behalf of their minor child, L.L., | ) ) ) | CIVIL NO. 10-00626 LEK-RLP |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| STATE OF HAWAII, DEPARTMENT OF EDUCATION, et al. | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER AFFIRMING THE HEARINGS OFFICER'S
SEPTEMBER 27, 2010 DECISION**

Before the Court is an appeal by Plaintiffs J.L. and

P.L., individually and on behalf of their minor child, L.L.

(collectively "Plaintiffs") of the administrative hearings

officer's ("Hearings Officer") Findings of Fact, Conclusions of

Law and Decision ("Decision"), filed on September 27, 2010.

Plaintiffs filed their Opening Brief in the instant case on

May 23, 2011. Defendants the State of Hawaii Department of

Education and Kathryn Matayoshi, in her official capacity as

Acting Superintendent of the Hawaii Public Schools (collectively

"the DOE" or "Defendants"), filed their Answering Brief on

June 22, 2011. The Court heard oral argument in this matter on

August 22, 2011. Appearing on behalf of Plaintiffs was

Keith Peck, Esq., and appearing on behalf of Defendants was

Steve Miyasaka, Esq. After careful consideration of the parties'

briefs, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY AFFIRMED for the reasons set forth below.

## BACKGROUND

Plaintiffs filed their Complaint on October 26, 2010 pursuant to the Individuals with Disabilities Education Act of 2004, 20 U.S.C. § 1400 *et seq.* ("IDEA"). Plaintiffs appeal from the Hearings Officer's Decision dismissing the Complaint which Plaintiffs filed with the Department of Commerce and Consumer Affairs Office of Administrative Hearings ("Administrative Complaint").[1] Defendants filed their Answer to Complaint on November 24, 2010.

## I. Factual and Administrative Background

At the time of the Decision, L.L. (or "Student") was five years old. He has been diagnosed with Pervasive Developmental Disorder, an autism spectrum disorder, and he is eligible to receive special education and related services under the IDEA in the category of autism. According to the Decision, Student began a program at the Pacific Autism Center ("PAC")[2] in

---

[1] The Decision can be found in the Administrative Record on Appeal ("ROA") at 103-20. The Administrative Complaint can be found in the ROA at 2-7.

[2] PAC is a clinic that provides services for children on the autism spectrum. PAC employs Applied Behavioral Analysis ("ABA") methodology, primarily on a one-on-one basis, between thirty five and forty hours per week. [Decision at 4.] PAC is referred to
(continued...)

2008, and has remained there since then pursuant to prior administrative decisions and by virtue of stay-put.[3]  L.L.'s program at PAC includes attendance at Parent Participation Nursery School ("PPNS") with a one-on-one PAC therapist in the morning and an afternoon home program with one-on-one PAC therapists.  [Decision at 3-4.]

The Decision addresses the DOE's development of an individualized educational program ("IEP") to transition L.L. from PAC to a DOE school.[4]  The crux of this case is whether the January 27, 2010 IEP ("1/27/10 IEP")[5] denied L.L. a free appropriate public education ("FAPE") because it did not include an appropriate behavioral support plan ("BSP") and/or feeding plan.

---

[2](...continued)
as the "Private Placement" or "PP" in the Decision.

[3] Plaintiffs' Opening Brief, however, suggests that J.L. and P.L. (collectively "Parents") were paying for L.L.'s program at PAC but that, some time after the filing of the Administrative Complaint, Parents removed L.L. from PAC due to lack of funding. [Opening Br. at 4.]

[4] The intended school is Kainalu Elementary School ("Kainalu"), where L.L. was to attend the Junior Kindergarten program.  [ROA, Pets.' Exh. 1, at 20.]

[5] The 1/27/10 IEP can be found in the ROA as Petitioners' Exhibit 1, pages 1-17, and as Respondent's Exhibit 2, pages LL 010-027.  The January 28, 2010 Prior Written Notice ("1/28/10 PWN") discussing the 1/27/10 IEP, and the January 28, 2010 letter to J.L. and P.L. from Lanelle Hibbs, the principal of Kainalu, transmitting the 1/27/10 IEP and the 1/28/10 PWN are also part of Petitioners' Exhibit 1 at 18-19, and 20-21, respectively.

The Decision recognized the importance of L.L.'s feeding issues and the efforts that PAC has undertaken to address them:

      6.    Student has a history of food refusal and feeding problems.  He is small for his age, and qualifies as a child with failure to thrive. Student is very sensitive.  If Student is given a certain look or something is said to him about food, he may refuse to eat.  Presently, Student is eating regularly, however, during times of illness or stress, Student may refuse to eat.

      7.    Student's issues with eating and food refusal are based on his disability and are a behavior, not a medical problem.

      8.    The Private Placement provides Student with extremely detailed feeding-related programs based on ABA concepts.  Student's feeding issues are behavior based and can be shaped and reinforced like any other behavior.  As Student's program is based on ABA, detailed data is taken on Student's progress, including the number of bites taken each day at the Private Placement. Initially, Student had zero bites of food per day. Student has progressed quite a bit.  By January 2009, he had taken over 100 bites of food per day in the Private Placement setting.

      9.    The first Private Placement eating program is designed to monitor and maintain Student's regular eating, to ensure that he eats regularly, in typical, appropriate settings where other individuals eat, that he eat with peers, for an appropriate period of time . . . , etc.  The second program is a shake (drink) program to ensure that Student is getting the appropriate number of calories and is able to maintain his weight.  The third program involves getting Student to try new foods (something that is extremely adverse to him). . . .

      10.  The Private Placement's eating/feeding programs for Student are to ensure that he is able to independently and regularly eat preferred foods.  Then new foods will be introduced for Student.  Shaping a child's behavior with eating is very difficult.  Much care is taken so that eating does not become an adverse experience for

4

> Student. If eating becomes an adverse experience,
> Student will gag or vomit and this would interfere
> and cause regression with Student's present system
> of appropriate eating of preferred foods.

[Decision at 4-5 (footnote omitted).] Each of PAC's programs has thirty to fifty targets or tasks for L.L. to learn, and PAC collects daily data on the programs and targets. L.L.'s IEP team, however, did not have access to that data when it developed the 1/27/10 IEP. [Id.]

On March 27, 2009, the DOE agreed to re-evaluate L.L., including conducting a Functional Behavior Assessment ("FBA"). Plaintiff J.L., L.L.'s mother ("Mother"), consented to the evaluation. Jenny Wells, Ph.D., conducted the FBA on May 26, 2009 and October 7, 2009. Dr. Wells noted that Mother's primary concerns were L.L.'s eating and inappropriate behavior, such as tantrums. The FBA included observing L.L., via closed circuit camera, while he interacted with his one-on-one PAC therapist for approximately one hour. Dr. Wells did not observe any food related problems or inappropriate behavior during that time. Dr. Wells asked to speak to the PAC therapist, but was informed that the therapist could not speak to her. Any questions that Dr. Wells had would need to be submitted to PAC in writing through Mother. On October 7, 2009, Dr. Wells observed L.L. in the PPNS program. She did not observe any eating problems or inappropriate behavior during that time. L.L.'s teacher and his one-on-one therapist told Dr. Wells that L.L.'s behavior that day

was typical for him.  [Id. at 5-6.]

Abby Royston, Ph.D., a DOE psychologist for the
Windward Complex, conducted an Emotional Behavior Assessment of
L.L. on June 2, 2009, September 8 and 29, 2009, and October 10,
2009.  Dr. Royston observed L.L. at home with Mother and at PPNS
with his PAC therapist.  Dr. Royston opined that PPNS was not an
appropriate placement for L.L. because he was more advanced than
his peers; he was ready for interactive play while they were not.
[Id. at 6.]

Barbara Ward, a DOE speech language pathologist,
evaluated L.L.'s speech and language needs on May 29, 2009 and
September 17, 2009 at home, and on October 14, 2009 at PPNS.
Ms. Ward, however, was not able to complete the assessment
because of the time restraints that PPNS imposed.  Although she
noted the need for more complete testing and assessments,
Ms. Ward opined that L.L.'s language was sufficient for him to
participate in and communicate in a school setting.  [Id. at 6-
8.]

In a November 2, 2009 letter, Rebecca Rosenberg, the
DOE District Education Specialist, reiterated her request that
Mother provide the DOE with copies of PAC's current assessments
of L.L., such as a copy of his updated Assessment of Basic
Language and Learning Skills - Revised ("ABLLS") assessment or
updated Brigance testing information.  Ms. Rosenberg also asked

6

Mother to invite a member of L.L.'s PAC team to L.L.'s upcoming eligibility meeting.  Ms. Rosenberg told Mother that she would send PAC an invitation as well.  Ms. Rosenberg never received updated information from Mother in response to this request. [Id. at 8.]  At the January 27, 2010 IEP team meeting, Mother provided the team with information about L.L.'s May 1, 2009 ABLLS, but the DOE later learned that L.L.'s ABLLS assessment had been updated on November 1, 2009.  Mother testified that she asked PAC for information about L.L.'s updated ABLLS assessment, but it was not provided to her.  [Id. at 10-11.]

At the November 18, 2009 eligibility meeting, the team found that L.L. continued to be eligible for special education and related services under the category of autism.  An IEP team meeting was scheduled for January 27, 2010.  On January 19, 2010, Mother invited a PAC supervisor, who supervised L.L.'s therapist and who was familiar with L.L.'s program at PAC, to the IEP team meeting.  The supervisor, however, informed Mother that she could not attend the meeting due to a scheduling conflict.  [Id. at 8.]

## II. January 27, 2010 IEP and the Administrative Complaint

Mother participated in the January 27, 2010 IEP team meeting.  Mother's main focus and concern at the meeting was L.L.'s food refusal and feeding issues.  [Id. at 10.]

The Hearings Officer found that the BSP which the team went over at the meeting included "strategy skills to be taught,

7

supports to be used, including visual supports for transition, information about positive reinforcement, warnings prior to changes, deep breathing & deep pressure (stress management), and food refusal[.]" [Id. at 9.] The team discussed it throughout the meeting, and it "served as a reference to most of the information discussed at the meeting[,]" but it was not read out loud until the end of the meeting. [Id.]

The IEP team discussed L.L.'s food refusal in developing his present levels of educational performance ("PLEP") and the IEP's goals and strategies. Roxanne Rokero, the DOE autism consulting teacher ("ACT"), asked Mother questions about L.L.'s food refusal, including what types of interventions PAC used and what could be some of the causes of L.L.'s food refusal behaviors. Mother responded that the issue was complicated and that PAC used varying interventions. [Id.] The 1/27/10 IEP, however, did not include a feeding plan.

The IEP team also discussed a transition plan, which included: a DOE paraprofessional working with the PAC therapist at PPNS for two to three weeks; the ACT visiting PPNS on a weekly basis; the PAC therapist accompanying L.L. to Kainalu until the IEP team determined that L.L.'s transfer was successfully completed; and DOE payment of all PAC costs associated with the transfer. [Id. at 10.]

Plaintiffs were dissatisfied with the 1/27/10 IEP and

8

filed their Administrative Complaint.  The Administrative Complaint raised the following issues: 1) L.L. requires a BSP and a feeding plan that are developed with parent input and that sufficiently address L.L.'s needs; 2) L.L.'s goal/objective for eating is insufficient to address his deficits in that area; 3) L.L. requires a formal transfer plan prior to his scheduled transfer; 4) the IEP team is improperly constituted because L.L. needs a qualified person to supervise his feeding problems and because a one-time consultation with a nutritional consultant is insufficient; 5) the IEP team is improperly constituted because L.L. needs a qualified person to oversee his program in general; and 6) L.L. needs more frequent speech therapy services to address his needs.  [Administrative Complaint at 3-5.] Plaintiffs sought: reimbursement of any educational and related expenses incurred between the filing of the Administrative Complaint and L.L.'s annual IEP review date of January 27, 2011; a finding that they are the prevailing party; attorneys' fees and costs in this and related matters; and any other appropriate relief.  [Id. at 5-6.]

The Hearings Officer conducted the due process hearing on May 27 and 28, 2010 and June 2, 2010.  [Decision at 2-3.]  The parties submitted written closing briefs.  [ROA at 33-47 (Pltfs.' Closing Brief), 48-98 (DOE's Closing Brief).]

## III. **Decision**

The Hearings Officer filed the Decision on
September 27, 2010, due in part to her unexpected medical leave.
[Decision at 3.] The Hearings Officer framed the issue in the
Administrative Complaint as whether the 1/27/10 IEP offered L.L.
a FAPE. [Id.]

In the Decision, the Hearings Officer reviewed L.L.'s
food refusal and eating concerns and PAC's programs to monitor
and regulate his eating. The Hearings Officer also reviewed the
DOE's attempt to re-evaluate L.L. and the difficulties that the
DOE encountered in gaining access to information about, and
observations of, L.L. The Hearings Officer noted that:

> By letter dated September 15, 2009, to
> Mother, the Private Placement confirmed their
> policy regarding DOE observations, and additional
> meetings with PP staff. Mother provided the DOE
> with this information. According to the letter:
> (a) DOE representatives may observe students at
> the Private Placement per this policy –
>     (1)  Including two weeks notice at a mutually
> agreeable time;
>     (2)  DOE personnel must follow PP's schedule
> and not interfere with the student's program;
>     (3)  Up to three DOE personnel may visit at a
> time, as frequently as once a quarter;
>     (4)  This observation does not include any PP
> personnel shadowing or being present, with the
> exception of administrative staff setting up
> monitors for observation;
>     (5)  The Private Placement is "more than
> willing" to allow DOE personnel to meet with a PP
> Supervisor on the student's program or behavior
> plan, with the parents' consent. However, this is
> not included in the regular PP tuition package
> that Student is under. Therefore, any
> communication between PP personnel who are

> familiar with Student's program and/or behavior
> plan is a separate service and must be paid for by
> Parents or the DOE.  This includes IEP meeting and
> other meetings beyond what is in Parents' PP
> package.

[Id. at 7 (emphases in original) (footnote omitted).]  The

Hearings Officer noted that Plaintiffs' PAC package included

parent meetings, parent training, weekly updates, and team

meetings.  [Id. at 7 n.4.]  Mother would have information about

L.L.'s food refusal problem from those aspects of the PAC

program, as well as from monthly PAC home visits and her personal

knowledge of her child.  Mother also had the cell phone number

for Christi Reed, the PAC Director, and could call Ms. Reed at

any time to address concerns, including food refusal.  Further,

PAC has video tapes of L.L. eating at home.  [Id. at 9-10.]

    The Hearings Officer emphasized the DOE had "great

difficulty" obtaining information about Student' program at PAC,

in spite of its requests to PAC and to Mother.  [Id. at 10.]

    The Hearings Officer found that, in addition to

addressing L.L.'s academic, functional, social, adaptive, and

motor needs, the 1/27/10 IEP included the following services to

address L.L.'s food refusal and eating issues:

> a. educational consultation; b. 1:1 instructional
> support; c. Public Health Nurse/Nutritional
> consult; d. sensory diet; e. FBA/BSP; f. visual
> schedules[;] g. parent training; h. team meetings;
> i. ABA strategies; j. monthly monitoring of
> Student's height & weight; k. IEP goal and
> objective to try new foods; l. special education;
> m. speech-language therapy; n. occupational

therapy; o. goals and objectives in the IEP to help Student deal with stress management (times he is inclined to engage in food refusal); and p. instructional plans.

[Id. at 9.]  The 1/27/10 IEP provided that L.L. would receive his special education services and supports primarily in the general education classroom.  [Id. at 11.]

The Hearings Officer found that the IEP team discussed "[a]ll of Student's needs, language, fine motor, social, self-care, academic, behavior, and food refusal" at the January 27, 2010 IEP team meeting.  She emphasized that Mother attended that meeting and had the opportunity to provide input about L.L.'s needs.  [Id. at 10.]

### A.  BSP and Feeding Plan

The Hearings Officer made the following findings about L.L.'s BSP and/or feeding plan:

> 40.  Based on the information available to the Team on January 27, 2010, the FBA/BSP and transfer plan are appropriate for Student. Student is provided with a multi-disciplinary approach that includes supports to address all of his unique needs, including food refusal and feeding.  The issue will be analyzed and worked on by a special education teacher, regular education teacher, speech language pathologist, occupational therapist, paraprofessional, educational consultant, and public health nurse/nutritionist, among others.  Student will receive appropriate instruction, supports, and behavioral interventions to address his food refusal issue and other needs through the IEP.
> 41.  A feeding plan or food program is a plan or schedule based on what the child will eat.  It is not based on caloric intake.  The plan or program includes foods liked and disliked by the

12

child.  The purpose of a feeding plan or food
program is to develop and implement strategies to
encourage children to eat new foods or foods they
don't like.
    42.  In order to develop a feeding plan,
among other things, a functional analysis of the
food refusal process must be conducted.  According
to the ACT, a functional analysis was not
completed for Student because the DOE did not have
an opportunity to provide the analysis.  A
functional analysis for food refusal requires an
in depth analysis of Student's behavior where the
DOE can have access to Student and manipulate his
behaviors to gather the necessary information.  In
addition, Mother did not provide much information
about Student's PP feeding plan.  Without the
necessary information, a feeding plan would be
highly ineffective or at most, possibly harmful to
the child.

[Id. at 11-12.]

    The Hearings Officer concluded that L.L. did require a
BSP and noted that the 1/27/10 IEP and the 1/28/10 PWN affirmed
that he needed a BSP with support on a daily basis.  As to the
related issue of the feeding plan, the Hearings Officer
emphasized the DOE's difficulties in obtaining information about
L.L.'s PAC program.  The Hearings Officer concluded that,
although Mother may not have known all of the thirty to fifty
tasks in L.L.'s three feeding programs at PAC, she must have had
some familiarity with the interventions and techniques that PAC
used to facilitate L.L.'s eating.  Mother, however, did not share
this information with the IEP team.  The Hearings Officer also
noted that Mother did not dispute the fact that the IEP team
discussed L.L.'s behavior at the team meeting; she only argues

that the BSP document was not read until the end of the meeting. [Id. at 14-15.]  The Hearings Officer concluded that, "[i]n spite of the extreme limitations placed on the DOE Expert [Dr. Wells] during her observation of Student, by the PP, and PPNS, the DOE Expert conducted appropriate observations of Student and developed an appropriate FBA."  [Id. at 15.]  The team used the FBA to discuss and develop a BSP based on the information available to the team at that time.  [Id.]

The Hearings Officer also acknowledged that L.L. requires a feeding plan or food program.  She reiterated, however, that one would be ineffective or potentially harmful if it was not based upon proper information and a complete functional analysis of the food refusal problem.  Further, DOE requested the necessary information from Parents and PAC, but Parents and PAC did not provide the information.  The Hearings Officer concluded that, in spite of the lack of a feeding plan, the 1/27/10 IEP offered Student an appropriate program, based on available information at the time.  Plaintiffs therefore failed to meet their burden of proof as to this point of error.  [Id.]

**B.   IEP Eating Goal and Objective**

Plaintiffs argued that the 1/27/10 IEP's goal and objective for eating, in comparison to his program at PAC, was insufficient for L.L.'s needs.  The Hearings Officer emphasized that the information in L.L.'s food program at PAC was not

14

provided to the IEP team and that, in order for the IEP team to have the information, L.L.'s parents had to either provide the information themselves or pay for PP to discuss the program with the team.  The only other option was for the DOE to pay for PP to discuss L.L.'s program.  [Id. at 16.]  In concluding that Plaintiffs did not meet their burden of proof as to this point of error, the Hearings Officer stated:

> DOE pays PP $16,000.00 a month for Student's program.  The policy that requires parents or the DOE to pay more money on top of the $16,000.00 a month for basic information for the child's educational program cuts negatively against the purpose for developing the January 27, 2010IEP (sic) – to provide Student with an appropriate education program that meets his unique needs and provides him with educational opportunities and benefit.
> Petitioners cannot withhold information at the IEP meeting, and then file a request for hearing because the IEP does not offer Student a FAPE.  The goal is to work together as a team – Parents, DOE and PP, to provide an appropriate educational program for Student.

[Id.]

##    C.    Other Points of Error

The Hearings Officer also concluded that Plaintiffs failed to meet their burden of proof as to their other points of error.  As to the lack of a finalized transfer plan, the Hearings Officer found that the 1/28/10 PWN gave a detailed description of the plan to transfer L.L. to Kainalu.  [Id. at 17.]  As to the argument that L.L. required a qualified person to supervise his feeding plan, the Hearings Officer concluded that this

supervision is provided by the multi-disciplinary IEP team as a whole. The Hearings Officer emphasized that the team includes "a special education teacher, regular education teacher, ACT, speech language pathologist, occupational therapist, public health nurse/nutritionist, and a paraprofessional, among others." [Id.] Finally, as to Plaintiffs' argument that the term "Educational Consultant" did not sufficiently define the qualifications necessary for the person tasked with overseeing L.L.'s program, the Hearings Officer noted that, although the DOE is required to place qualified persons in the positions identified in the IEP, the IEP itself need not include the providers' qualifications. [Id. (citations omitted).] The Hearings Officer found that Ms. Rokero, the ACT, would serve as the educational consultant and that she "was more than qualified to serve as a consultant for all of the aspects of Student's educational program, including food refusal and feeding issues." [Id. at 18.]

The Hearings Officer ultimately concluded that Plaintiffs failed to prove that the 1/27/10 IEP denied L.L. a FAPE. The Hearings Officer dismissed the Administrative Complaint and found the DOE to be the prevailing party. [Id.]

The instant action followed.

## IV. **Plaintiffs' Opening Brief**

In their Opening Brief, Plaintiffs state that the crux of the case is the DOE's "failure to adequately address Student's

need for a plan to address his behavioral difficulties in obtaining sufficient nutrition." [Opening Br. at 2.] Plaintiffs argue that L.L.'s behavioral difficulties will not be sufficiently addressed by a one-time consultation with a nutritionist because a nutritionist does not address behavior. Further, Plaintiffs argue that the IEP team improperly delegated the decision whether a feeding plan was needed to the nutritionist and the occupational therapist. It was the IEP team's responsibility to address L.L.'s feeding issues because that was a known deficit at the time of the January 27, 2010 IEP team meeting.

Plaintiffs ask the Court to: reverse the Decision and find that Plaintiffs are the prevailing party; award reimbursement for L.L.'s private placement, including related services and transportation, from the filing of the Administrative Complaint until Parents withdrew L.L. from PAC for lack of funding; award attorneys' fees and costs under 20 U.S.C. § 1415(e) and under the Rehabilitation Act of 1973; and enter any other appropriate relief.

## IV. **Defendants' Answering Brief**

Defendants filed their Answering Brief on June 22, 2011. Defendants first summarized the testimony of each witness who testified before the Hearings Officer. Some of the relevant background testimony is discussed here.

Defendants note that Christi Reed, the Director of PAC, who testified as a Plaintiffs' witness, stated that L.L.'s attendance at PPNS did not constitute attendance at PAC. [Answering Br. at 2 (citing ROA, T-I, at page 25, lines 1 to 2).] She admitted that PAC is not a school, and it does not have licensed special education teachers. [Id. at 3 (citing ROA, T-I, at page 53, lines 3 to 4, 7 to 9).] Ms. Reed also testified about PAC's three program procedures to address L.L.'s food refusal: Food Program Procedure; Shake Program Procedure; and tasting and targeting new foods.[6] [Id. (citing ROA, T-I, at page 57, line 1 to page 66, line 8).]

Mother testified that, when she wrote to PAC on January 19, 2010, to invite a representative to the January 27, 2010 IEP team meeting, she also requested a new report about L.L. to give to the IEP team. Mother, however, testified that she did not receive any additional records from PAC prior to the meeting. [Id. at 4 (citing ROA, T-I, at page 127, lines 1 to 17, page 169, lines 17 to 19).]

Defendants also highlight testimony by occupational therapist, Heather Murphy, who testified that occupational therapy, which is provided for in the IEP, could address sensory

---

[6] The Food Program Procedure is in the ROA as Petitioners' Exhibit 7, at page 144. The Shake Program Procedure is in Exhibit 7, at page 142, and tasting and targeting new foods procedure is in Exhibit 7, at pages 146 and 134.

needs that contribute to L.L.'s food refusal.  [Id. at 4-5.]
Public Health Nurse Christina Stefanov testified about the
difference between a feeding program or food plan, as compared to
a dietary/nutritional plan.  The primary difference is that a
dietary/nutritional plan is more medically based and considers
calorie intake and the child's height, weight, and activity
level.  Ms. Stefanov testified, however, that a doctor,
nutritionist, or mental health specialist can also develop a
feeding plan.  She cautioned that not every child in the failure
to thrive category needs a feeding plan and that monitoring the
child's height and weight is necessary.  She also testified about
the services she would provide as a student's nutritional
consultant.  [Id. at 5-7.]

   A.   **Dismissal of the Complaint**

        Defendants first argue that, although the Federal Rules
of Appellate Procedure do not apply to this case, this Court
should apply the guidelines for opening briefs in Fed. R. App. P.
Rule 38(a)(9), which requires that the appellants support their
contentions with citations to the record and to legal authority.
Defendants also argue that the Court should apply the principle
that Plaintiffs waived any issues that they failed to raise in
their Opening Brief.  Defendants urge this Court to dismiss
Plaintiffs' Complaint.

        In Defendants' view, if the Court is not inclined to

dismiss the Complaint, the only issue presented by Plaintiffs'
Opening Brief is whether the 1/27/10 IEP failed to address L.L.'s
need for a BSP or a feeding plan.

**B.    <u>BSP</u>**

The 1/27/10 IEP provided L.L. with a BSP in the
Supplementary Aids and Services, Program Modifications and
Supports for School Personnel section.  [1/27/10 IEP at 15.]
Defendants argue that the Hearings Officer's finding that L.L.
had an appropriate BSP based on available information is
supported by the BSP and the testimony of two expert witnesses,
Dr. Wells and Dr. Royston, who opined that the BSP was
appropriate.  [Answering Br. at 21 (citing ROA, T-3, at page 430,
line 10 to page 431, line 1, page 515, lines 6 to 23).]
Defendants emphasize that neither Plaintiffs' witnesses Ms. Reed
nor Dr. Colin Denny testified that the BSP was inappropriate.
Defendants also argue that the Hearings Officer's findings were
supported by the testimony of Rebecca Rosenberg, the District
Education Specialist, and by documents in the record.  Defendants
therefore urge the Court to find that the Decision is thorough
and careful on this issue and to affirm this portion of the
Decision.

**C.    <u>L.L.'s Feeding Issues</u>**

Defendants next argue that the BSP and the 1/27/10 IEP
adequately addressed L.L.'s food refusal and feeding needs.

20

Although not specifically addressed in the Decision, Defendants note that the BSP addressed L.L.'s feedings needs in the following preventative strategies: allowing additional time to complete meals, if necessary; clearly defining the physical eating area; and considering sensory based factors like noise, smells, lighting, etc. [Id. at 22-23 (citing ROA, Respondent's Exhibit 12, at page LL095).] The Hearings Officer did find in Finding of Fact 29 that the IEP addressed L.L.'s feeding needs in variety of ways. Defendants argue that Finding of Fact 29 is supported by the 1/27/10 IEP and by Ms. Rokero's testimony. Defendants contend that Finding of Fact 29 supports the conclusion that the 1/27/10 IEP provided an appropriate program based on available information. Plaintiffs have presented no evidence that these strategies to address L.L.'s feeding issues were insufficient without a specific feeding plan. Defendants therefore urge the Court to find that this portion of the Decision is thorough and careful on this issue and affirm this portion of the Decision.

    D.    **Whether PAC is an Appropriate Placement**

        If this Court finds that the 1/27/10 IEP denied L.L. a FAPE, Defendants argue that the Court should only remand the case to the Hearings Officer or order reimbursement if the Court finds that PAC is an appropriate placement. Defendants acknowledge that the Hearings Officer did not specifically address the

appropriateness of L.L.'s placement at PAC, but they contend that there is uncontroverted evidence in the record that PAC is not an appropriate placement.

Defendants also argue that the Court should rule that PAC is not an appropriate placement pursuant to Haw. Admin. R. § 8-60-27(c)(2) because it did not allow the DOE to obtain information to carry out its responsibility to ensure that L.L. received a FAPE. Defendants acknowledge that the Hearings Officer did not make findings or conclusions on this issue, but they contend that there is ample support for such a ruling in the Hearings Officer's existing findings and conclusions. Defendants urge the Court to deny Plaintiffs' request for reimbursement.

## STANDARD

### I.  IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." Hoeft ex rel. Hoeft v. Tuscon Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310, 108 S. Ct. 592, 597, 98 L. Ed. 2d 686 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education,

employment, and independent living[.]" 20 U.S.C. §
1400(d)(1)(A).

The IDEA defines FAPE as:

special education and related services that –
(A) have been provided at public expense,
under public supervision and direction, and
without charge;
(B) meet the standards of the State
educational agency;
(C) include an appropriate preschool,
elementary school, or secondary school
education in the State involved; and
(D) are provided in conformity with the
individualized education program required
under section 1414(d) of this title.

20 U.S.C. § 1401(9). To provide a FAPE in compliance with the
IDEA, a state educational agency receiving federal funds must
evaluate a student, determine whether that student is eligible
for special education, and formulate and implement an IEP. See
generally 20 U.S.C. § 1414. The IEP is to be developed by an
"IEP Team" composed of, *inter alia*, school officials, parents,
teachers and other persons knowledgeable about the child. §
1414(d)(1)(B).

"Procedural flaws in the IEP process do not always
amount to the denial of a FAPE." L.M. v. Capistrano Unified Sch.
Dist., 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted).
Once a procedural violation of the IDEA is identified, the court
"must determine whether that violation affected the substantive
rights of the parent or child." Id. (citations omitted).
"[P]rocedural inadequacies that result in the loss of educational

23

opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." Id. (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Id. at 433 (citations and quotation marks omitted).

If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency. See 20 U.S.C. § 1415(b)(6), (f)(1)(A). Parents may also send their student to a private program and seek retroactive tuition reimbursement from the state. See Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2493, 2496 (2009) (citations omitted). Where parents unilaterally withdraw a child from public school, they "do so at

their own financial risk." Id. at 2496 (citations and internal quotation marks omitted). Parents challenging an IEP are entitled to reimbursement only if "a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act." Id. (citations and internal quotation marks omitted); see also 34 C.F.R. § 300.148(c).

## II.  Standard of Review

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court –
>      (i) shall receive the records of the administrative proceedings;
>      (ii) shall hear additional evidence at the request of a party; and
>      (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings. L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)) (some citations omitted). The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling. J.W., 626 F.3d at 438 (citing Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir.

1987)).  In reaching that determination, the court should

consider the thoroughness of the hearings officer's findings,

increasing the degree of deference where said findings are

"'thorough and careful.'"  L.M., 556 F.3d at 908 (quoting

Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892

(9th Cir. 1995)).  The district court should give "substantial

weight" to the hearings officer's decision when the decision

"evinces his careful, impartial consideration of all the evidence

and demonstrates his sensitivity to the complexity of the issues

presented."  Cnty. of San Diego v. Cal. Special Educ. Hearing

Office, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation and

quotation marks omitted)).  Such deference is appropriate because

"if the district court tried the case anew, the work of the

hearing officer would not receive 'due weight,' and would be

largely wasted."  Wartenberg, 59 F.3d at 891.  "[T]he ultimate

determination of whether an IEP was appropriate," however, "is

reviewed de novo."  A.M. ex rel. Marshall v. Monrovia Unified

Sch. Dist., 627 F.3d 773, 778 (9th Cir. 2010) (citing Wartenberg,

59 F.3d at 891).

　　　A court's inquiry in reviewing IDEA administrative

decisions is twofold:

>　　　"First, has the State complied with the procedures set
> forth in the Act?  And second, is the individualized
> educational program developed through the Act's
> procedures reasonably calculated to enable the child to
> receive educational benefits?"  [Rowley, 458 U.S. at
> 206-07] (footnotes omitted).  "If these requirements

are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Id. at 207.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling. Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted). The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed. J.W., 626 F.3d at 438 (citation omitted).

## DISCUSSION

As a general matter, the Court FINDS that the Hearings Officer's findings and conclusions are "thorough and careful" and therefore entitled to increased deference. See L.M., 556 F.3d at 908 (citation and internal quotation marks omitted). The Decision set forth extensive findings of fact and justified its conclusions of law with reference to the factual record presented over the three-day hearing. The Hearings Officer summarized the testimony of the key witnesses and created a detailed decision explaining her factual findings and legal conclusions.

## I. Dismissal of the Complaint and Scope of the Appeal

Defendants argue that, although the Federal Rules of Appellate Procedure do not apply to this case, the Court should use the requirements of Rule 38(a)(9) as a guide and dismiss

27

Plaintiffs' Complaint because Plaintiffs failed to support the contentions in their Opening Brief with citations to the record and legal authority.

While an opening brief in an administrative appeal which fails to point the Court to the relevant portions of the administrative record or to the applicable legal authority is not an effective form of advocacy, the Court finds that dismissal of the Complaint is not warranted. The Opening Brief was sufficient to identify the issue before the Court in this appeal, and there is no indication that the lack of factual and legal citations in the Opening Brief prejudiced Defendants in the preparation of their Answering Brief. Defendants' request to dismiss the Complaint is therefore DENIED.

The Court, however, agrees with Defendants that the Opening Brief limits the issue in this case to whether L.L. was denied a FAPE because the 1/27/10 IEP failed to adopt an adequate BSP and failed to address L.L.'s need for a feeding plan.

## II.  Adequacy of the 1/27/10 IEP

The Hearings Officer acknowledged that L.L.'s unique needs require both a BSP and a feeding plan. [Decision at 14-15.] The Hearings Officer noted that the IEP team "discussed Student's behavioral needs, including food refusal, and the positive behavioral strategies and interventions to be used with Student" throughout the three-hour January 27, 2010 team meeting.

[Id. at 15.]  At the end of the meeting, a summary of the FBA/BSP was read to the team.  [Id.]

The summary of the FBA/BSP includes:

- "Avoidance of sensory issues associated with food consumption."
- "Allow extra time to complete meals if necessary."
- "Clearly define the physical space for eating."
- "Consider sensory based environmental factors such as noises, smells, lighting, etc."
- "Ask [Student] to sample new foods regularly in a non stressful/predictable manner . . . ."

[ROA, Resp.'s Exh. 12, at LL 094-95.]  The BSP calls for the positive reinforcement of social praise and participation in preferred activities after eating periods.  [Id. at LL 095.]

The Hearings Officer concluded that:

> In spite of the extreme limitations placed on [Dr. Wells] during her observation of Student, by the PP, and PPNS, [Dr. Wells] conducted appropriate observations of Student and developed an appropriate FBA.  The Team, including Mother, used the information in the FBA to discuss and develop an appropriate BSP.  The BSP was based on the information **available to the Team at the time**.

[Decision at 15 (emphasis added).]

The 1/27/10 IEP did not include a feeding plan.  It includes an annual goal that Student "will sample three new foods per quarter."  [1/27/10 IEP at 12.]  The goal was to be measured through observation, records, and a growth chart.  [Id.]  The 1/27/10 IEP also called for a one-time consultation between a Private Health Nurse/Nutritionist ("PHN/N") and L.L. and his family.  The PHN/N would advise the IEP team if further

consultation was necessary.  [Id. at 16.]

The Hearings Officer concluded that the 1/27/10 IEP offered L.L. an appropriate program, in spite of the lack of a feeding plan.  The Hearings Officer was concerned that developing a feeding plan based on inadequate information would be ineffective, and could in fact be dangerous to L.L.

> Without appropriate programming information and/or access to Student, the DOE was unable to conduct a functional analysis or develop a feeding plan. Even without a feeding plan, the IEP and BSP provide Student with an appropriate program, **based on the information the Team had on January 27, 2010**.  It is patently unfair for Petitioners to withhold information, then state that the IEP is flawed.

[Id. at 15 (emphasis added).]

### A.   DOE's Obligation to Obtain Necessary Information

As to both the adequacy of the BSP and the lack of a feeding plan, the Hearings Officer placed a considerable amount of emphasis on the fact that Mother and PAC did not cooperate with the DOE in disclosing information about L.L. and his program and progress at PAC.  The Court notes that Mother made efforts to obtain information to produce to the IEP team.  See, e.g., Decision at 10-11 (noting that Mother provided L.L.'s May 1, 2009 ABLLS to the team and she asked PAC for information about L.L.'s November 1, 2009 ABLLS, but it was not provided to her).  The evidence, however, also indicates that Mother was not always cooperative when called upon to share information with the IEP

30

team about L.L.'s feeding issues and program at PAC. The

Hearings Officer found that, when the IEP team discussed L.L.'s

food refusal in developing his PLEP and the goals and objectives,

Ms. Rokero, the ACT

> asked Mother very pointed and focused questions
> about Student's food refusal, including what types
> of interventions were provided to Student at the
> Private Placement and what are some things that
> might be causing Student's food refusal behaviors.
> Mother's response was that the food refusal issue
> is complicated and the interventions used by PP
> with Student varied.

[Decision at 9.] While Mother may not have known all of the

thirty to fifty targets or tasks in PAC's three food programs for

L.L., Mother must have known at least some information, based on

her participation in the PAC program and her interactions with

her child, about the interventions that PAC used to address

L.L.'s food refusal. Mother, for some reason, did not share that

information with the IEP team on January 27, 2010.

    As to PAC, while the Court understands that PAC must be

diligent in managing its operating expenses and that PAC

therefore has a policy not to provide any additional services

that are not within a student's payment agreement, the Court

questions whether PAC has taken the policy to its extremes in

this case. It does not seem to be in L.L.'s best interests for

PAC to prevent Dr. Wells, who PAC allowed to observe L.L. during

PAC sessions, from contemporaneously asking any questions of PAC

staff on May 26, 2009, or for PAC to fail to provide Mother with

a copy of documents, including the updated ABLLS assessment, that she requested for the IEP team.  Nevertheless, in spite of the fact that Mother and PAC could have done more to assist the DOE in its assessment of L.L. and in the preparation of his IEP, this does not negate the DOE's obligations.

The DOE agreed to conduct a reevaluation of L.L.  In conducting a reevaluation of a child, the IEP team must review existing evaluation data, and it is the DOE's responsibility to administer any assessments and evaluations necessary to produce the data that the team must consider.  See 20 U.S.C. § 1414(c). Section 1414(c) states, in pertinent part:

> (1) Review of existing evaluation data
> As part of an initial evaluation (if appropriate) and as part of any reevaluation under this section, the IEP Team and other qualified professionals, as appropriate, shall--
> > (A) review existing evaluation data on the child, including–
> > > (i) evaluations and information provided by the parents of the child;
> > > (ii) **current classroom-based, local, or State assessments, and classroom-based observations**; and
> > > (iii) **observations by teachers and related services providers**; and
> > (B) on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine--
> > > (i) whether the child is a child with a disability as defined in section 1401(3) of this title, and the educational needs of the child, or, in case of a reevaluation of a child, whether the child continues to have such a disability and such educational needs;
> > > (ii) the present levels of academic

32

> achievement and related developmental
> needs of the child;
> (iii) whether the child needs special
> education and related services, or in
> the case of a reevaluation of a child,
> whether the child continues to need
> special education and related services;
> and
> (iv) whether any additions or
> modifications to the special education
> and related services are needed to
> enable the child to meet the measurable
> annual goals set out in the
> individualized education program of the
> child and to participate, as
> appropriate, in the general education
> curriculum.
> (2) Source of data
> **The local educational agency shall administer such
> assessments and other evaluation measures as may
> be needed to produce the data identified by the
> IEP Team under paragraph (1)(B).**

(Emphases added.)  The Ninth Circuit has emphasized that a school

district cannot abdicate its duties under the IDEA.  In <u>N.B. v.</u>

<u>Hellgate Elementary School District, ex rel. Board of Directors,</u>

<u>Missoula County, Montana</u>, the Ninth Circuit stated:

> Hellgate suggested to C.B.'s parents that
> they obtain a general evaluation of C.B. at the
> September 22, 2003, IEP meeting.  It referred
> C.B.'s parents to the CDC for general testing.
> Hellgate contends that, despite this
> recommendation, C.B.'s parents failed to procure
> an evaluation from the CDC after the September
> 2003 IEP meeting.  The fact that Hellgate referred
> the parents to the CDC shows that Hellgate was
> mindful that an evaluation was necessary.  Thus,
> Hellgate's assertion that it did not suspect C.B.
> had autism prior to the November 2003 IEP meeting,
> because C.B.'s parents had not raised it at a
> prior IEP meeting, is not supported by the record.
> Hellgate failed to meet its obligation to evaluate
> C.B. in all areas of suspected disabilities after
> becoming aware of Dr. Gold's diagnosis.

Hellgate did not fulfill its statutory obligations by simply referring C.B.'s parents to the CDC. Such an action does not "ensure that the child is assessed," as required by 20 U.S.C. § 1414(b)(3)(C). See also <u>Union Sch. Dist. v. Smith</u>, 15 F.3d 1519, 1523 (9th Cir. 1994) (holding that a parent's failure to secure an evaluation, even if the parents agreed to obtain it, does not excuse the school district's obligation under the IDEA to secure such an evaluation). In <u>Union School District</u>, the parents of the student failed to turn over portions of a report issued by a specialist that may have been relevant to the placement of the student. <u>Id.</u> The court held that the "failure of the [parents] to turn over portions of a specialist's report cannot excuse the District's failure to procure the same information for itself." <u>Id.</u>

A school district cannot abdicate its affirmative duties under the IDEA. <u>W.G. [v. Bd. of Trs. of Target Range Sch. Dist. No. 23, Missoula, Mont.]</u>, 960 F.2d [1479,] 1484-85 [(9th Cir. 1992)]. In <u>W.G.</u>, the school failed to ensure that the proper parties were involved in the IEP meetings, as required by statute. <u>Id.</u>

> Target Range's arguments that the parents are to blame because they left the IEP meeting, did not file a dissenting report, and led the district to believe that the principal problem was transportation, are without merit. The parents had no obligation to file a dissent.
> . . .
> The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties. Target Range failed to do so. Target Range failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act.

<u>Id.</u> at 1485.

541 F.3d 1202, 1209-10 (9th Cir. 2008) (some alterations in original).

Thus, the Court emphasizes that, even if Mother and PAC were uncooperative, it did not negate the DOE's statutory duty to obtain the information necessary to reevaluate L.L. In this case, the Court finds that the DOE's observations of L.L. satisfied its information gathering obligations. In formulating the IEP, the team relied upon the following: "ABLLS (5/1/09), Functional Behavior Assessment (10/23/09), Speech/Language Assessment (6/8/09), Communication Assessment Addendum (10/23/09), Psychological Evaluation 6/9/09-7/4/09), (sic) Fine Motor Assessment (5/28/09), Emotional/Behavioral Assessment (10/19/09), team discussion." [1/28/10 PWN at 2.] In addition to these documents, the DOE also obtained a number of 2009 private assessments from Parents. [ROA, Respondent's Exhs. 5-16.] The Court, however, cautions the DOE to be mindful in the future that, as frustrating as a lack of cooperation from parents or a private placement may be, the DOE cannot use the lack of cooperation as an excuse to evaluate a student based on insufficient information. The Court now turns to the appropriateness of the BSP and whether the 1/27/10 IEP should have included a feeding plan.

B.    **Appropriateness of the BSP**

Plaintiffs essentially argue that the BSP was not sufficient to address the behavioral aspect of L.L.'s feeding issues. Plaintiffs, however, base this argument upon the fact

that the BSP is not as extensive and detailed as the components of PAC's feeding program. [ROA, Petitioners' Exh. 7, at 144 (Food Program Procedure), 142 (Shake Program Procedure), 146 & 134 (tasting and targeting new foods procedure).] First, Plaintiffs have not identified any evidence in the record that supports their claim that such an extensive program is necessary to address L.L.'s unique needs. Further, even if PAC's system is the optimal method to address L.L.'s food refusal, the IDEA does not require the DOE to offer L.L. the "absolutely best" or "potential-maximizing" program. See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted).

Further, the Court finds that the BSP is appropriate in light of Dr. Wells' October 7, 2009 observation of L.L. at PPNS. During the observation, L.L. ate "a snack of Vienna sausages and juice" and Dr. Wells "did not observe any problems with food refusal/eating . . . ." [Decision at 5-6.] Both L.L.'s teacher and his one-on-one therapist told Dr. Wells that L.L.'s behaviors that day were typical for him. [Id. at 6.] The Court also notes that the Hearings Officer found that "[p]resently, Student is eating regularly[.]" [Id. at 4.]

The Court therefore FINDS that the BSP presented at the 1/27/10 IEP team meeting was sufficient to provide L.L. with a "basic floor of opportunity[,]" see J.W., 626 F.3d at 439

(citation and quotation marks omitted), and was "appropriately designed . . . so as to convey . . . a meaningful benefit." Id. at 433 (citations and quotation marks omitted).  The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof as to the adequacy of the BSP.

   C.   **Lack of a Feeding Plan**

        Plaintiffs contend that L.L.'s food refusal was a known deficit at the time of the January 27, 2010 IEP team meeting and therefore the IEP team was required to include a feeding plan in the IEP.  Plaintiffs contend that the 1/27/10 IEP's requirement of one PHN/N consultation is insufficient and that the team improperly deferred the determination of whether a food program was necessary to the PHN/N.

        First, the Court notes that the 1/27/10 IEP provides that the PHN/N will advise the IEP team if further consultations are necessary.  [1/27/10 IEP at 16.]  Further, the testimony at the administrative hearing establishes that the PHN/N will provide additional services as well.  Christina Stefanov, a Department of Health public health nurse assigned to the Windward district, was qualified as an expert in the area of public health nursing.  [ROA, 5/28/10 Trans., at 201, 203.]  Ms. Stefanov testified that a doctor, nutritionist, or a mental health specialist like a behavioral specialist or psychologist can develop a feeding plan or food program, [id. at 205,] but she

also testified that not every child in the failure to thrive category needs a feeding plan or food program [id. at 208]. Ms. Stefanov testified that, when she is asked to provide a PHN/N consultation she: meets with the family to discuss what the child's needs are during school hours and what the family's concerns are; usually obtains consent to talk with the child's medical providers about what the provider feels the child's needs are at school and if the provider has a treatment or diet plan already in place; and calls a team meeting with DOE staff to discuss implementation of the plan and how to address the child's health concerns at school. [Id. at 208-09.] Ms. Stefanov testified that she provides ongoing consultation services to the DOE and families as part of her job. This includes: further assessments whenever requested by the DOE or the family; ongoing consultation with the student's medical providers if the parents consent; follow-up consultations with the family; attending doctor visits with the family if they feel they need an advocate or additional support; and giving referrals to nutritionists and other outside resources. [Id. at 209-10.] Ms. Stefanov also testified that, if requested, she participates in IEP team meetings to address any health related issues and recommend services for the child. [Id. at 210.] Further, she testified that the purpose of a PHN/N consultation is to determine what type of food program or food plan or dietary/nutritional plan

would be implemented for a particular student.  [Id. at 215.]

Thus, if the PHN/N determines after the initial consultation that a feeding plan is necessary for L.L., the PHN/N will advise the team and can attend the IEP meeting to discuss his or her recommendations and how to implement them with L.L.'s IEP team.  There is no indication that the PHN/N will unilaterally make decisions about L.L.'s feeding plan without the participation of the IEP team.

Further, the Court considers the decision not to include a feeding plan in the 1/27/10 IEP in the context of the transition plan.  The plan to transition L.L. from PPNS to Kainalu included: a DOE paraprofessional working with the PAC therapist at PPNS for two to three weeks; the ACT visiting PPNS on a weekly basis; the PAC therapist accompanying L.L. to Kainalu until the IEP team determined that L.L.'s transfer was successfully completed; and DOE payment of all PAC costs associated with the transfer.  [Decision at 10.]  With the DOE's express agreement to pay all PAC transfer costs, presumably PAC will make more information about L.L.'s program, including its three-part food program, available to the DOE.  During the transition time, the DOE will have further opportunities to observe any food related issues.

The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof as to the argument based on the failure to

include in a feeding plan in the 1/27/10 IEP. The Court therefore FINDS that, although it lacked a feeding plan, the 1/27/10 IEP was sufficient to provide L.L. with a "basic floor of opportunity[,]" see J.W., 626 F.3d at 439 (citation and quotation marks omitted), and was "appropriately designed . . . so as to convey . . . a meaningful benefit." Id. at 433 (citations and quotation marks omitted).

In summary, the Court agrees with the Hearings Officer that Plaintiffs did not prove by a preponderance of the evidence that the 1/27/100 IEP denied L.L. a FAPE.

<u>CONCLUSION</u>

On the basis of the foregoing, the Hearings Officer's Findings of Fact, Conclusions of Law and Decision, filed September 27, 2010, is HEREBY AFFIRMED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, August 31, 2011.



_/S/ Leslie E. Kobayashi_____
Leslie E. Kobayashi
United States District Judge


**J.L. AND P.L., INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, L.L. V. STATE OF HAWAII, DEPARTMENT OF EDUCATION, ET AL.; CIVIL NO. 10-00626 LEK-RLP; ORDER AFFIRMING THE HEARINGS OFFICER'S SEPTEMBER 27, 2010 DECISION**